UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------------X
LAPTOPPLAZA, INC.,

              Plaintiff,

        - against -

STARR INDEMNITY & LIABILITY COMPANY,

             Defendant.
----------------------------------------X

**MEMORANDUM AND ORDER**

**14 Civ. 7698 (NRB)**

**NAOMI REICE BUCHWALD**
**UNITED STATES DISTRICT JUDGE**


In this insurance coverage dispute, presently before the Court is a motion on behalf of defendant Starr Indemnity & Liability Company ("Starr") for summary judgment on the complaint brought by plaintiff LaptopPlaza, Inc. ("LaptopPlaza"). For the reasons stated herein, this motion is granted.

### BACKGROUND[1]

This dispute arises from a theft that occurred in the early hours of December 15, 2013, after two women approached a security

---

[1] The facts recited throughout this Memorandum and Order are drawn from the following sources: (1) Starr's Local Rule 56.1 Statement of Undisputed Facts (or "D 56.1"); (2) LaptopPlaza's Counterstatement to Starr's Rule 56.1 Statement of Undisputed Material Facts and LaptopPlaza's Statement of Additional Material Facts (or "P 56.1"); (3) the Declaration of John A.V. Nicoletti in Support of Starr's Motion for Summary Judgment ("Nicoletti Decl.") and the exhibits attached thereto; (4) the Declaration of Joshua L. Mallin in Opposition to Starr's Motion for Summary Judgment ("Mallin Decl.") and the exhibits attached thereto, including the transcript of the March 18, 2015 deposition of Thomas Shealy ("Shealy Tr."), and the transcript of the June 18, 2015 deposition of Tony Galindo ("Galindo Tr."); (5) LaptopPlaza's complaint filed September 23, 2014 (or "Compl."); and (6) the parties' memoranda of law in connection with the motion for summary judgment, including LaptopPlaza's Memorandum of Law in Opposition to Starr's Motion for Summary Judgment ("Pl. Opp.").

guard at LaptopPlaza's warehouse property in Miami, Florida, and asked him for assistance with their car.  D 56.1 ¶ 1; P 56.1 ¶ 1; Galindo Tr. at 60-65.  The guard had been tasked with watching LaptopPlaza's warehouse building and three storage trailers that LaptopPlaza had leased for three or four days to hold inventory as it completed a project inside.  When he left to assist the women, a thief driving a tractor cab stolen from an adjacent business connected the cab to one of the trailers containing LaptopPlaza merchandise and drove away.  D 56.1 ¶ 1; P 56.1 ¶ 1; Galindo Tr. at 60-65.  The Miami-Dade Police Department was ultimately able to recover the tractor cab but has never found the trailer or the stolen goods.  Compl. ¶¶ 29-30.  On December 15, 2013, LaptopPlaza, calculating its loss from the theft to be $710,684.00, submitted an insurance claim to Starr, which Starr denied a few months later.  Id. ¶¶ 31-33.  This litigation ensued.

I. **The Policy**

On November 12, 2009, LaptopPlaza's predecessor purchased a Marine Open Cargo Policy of Insurance from Starr (the "Policy"). D 56.1 ¶ 10; P 56.1 ¶ 10.  The parties' dispute centers on Endorsement No. 23, effective November 12, 2013 (the "Warehouse Endorsement"), which extends the Policy "to cover goods and merchandise which are owned by or held by the Assured [LaptopPlaza] . . . while temporarily detained in warehouses."  Nicoletti Decl., Ex. 4 at 65, Warehouse Endorsement ¶ 1 (emphasis added).

The Warehouse Endorsement only applies to certain properties:

6. This insurance shall not attach with respect to property described herein in any one store or warehouse listed in Clause 12 (below) for a greater amount than the corresponding limit of liability stated therein. If during the course of this insurance the Assured shall store or warehouse any goods at locations (excluding the Assured's premises) not listed in Clause 12, this insurance shall automatically apply for an amount not exceeding (**see schedule**) it being warranted by the Assured that such locations and values thereat shall be included in the first report filed with these Assurers [Starr] after the commencement of such storage.

Warehouse Endorsement ¶ 6 (first emphasis added). Clause 12, referenced by Clause 6 above, lists "warehouses to which these Assurers hereby extend approval and the limits of liability at each location." Id. ¶ 12. The first listed address, to which Clause 12 assigns a $10 million insurance limit, is "1801 NW 135th Avenue, Miami, FL, 33182," the address of the warehouse from which the trailer in question was stolen. Id. Clause 12 assigns a limit of $1 million to another Florida address and a limit of $50,000 to "Unnamed Locations." Id.

Finally, the Warehouse Endorsement has a warranty provision stating that "ALL LOCATIONS ARE FULLY SPRINKLERED or MEET NFPA GUIDELINES FOR PORTABLE FIRE EXTINGUISHERS AND INCLUDE CERTIFIED CENTRAL STATION SMOKE/BURGLAR ALARMS." Id.[2]

---

[2] The Policy also contains Endorsement No. 25, effective November 12, 2013, which extends coverage to "the goods insured while in due course of transit within the limits of the United States and Canada." Nicoletti Decl., Ex. 4 at 70, 2013 Inland Transportation Endorsement ¶ 1. This endorsement attaches "from the time the goods leave the factory, store, warehouse, or other initial point of shipment, and covers continuously thereafter, while in due course of transit, until delivered at store, warehouse or other point of destination."

## II. __LaptopPlaza Decides to Store Inventory in Trailers__

During the weekend of December 14-15, 2013, LaptopPlaza was installing rack storage in its warehouse building.  D 56.1 ¶ 2; P 56.1 ¶ 2; Shealy Tr. at 68.  Prior to that weekend, Thomas Shealy, LaptopPlaza's general manager, had discussed with LaptopPlaza's insurance broker a plan to move inventory out of the building to an alternate location while racks were being installed.  D 56.1 ¶ 14; P 56.1 ¶ 14.  Ultimately, LaptopPlaza decided to temporarily store the inventory in trailers outside the building.[3]  Three trailers were leased for three or four days, Shealy Tr. at 70-71, and LaptopPlaza contracted with a security company to provide 24-hour guard service to monitor the warehouse and trailers from December 13th to the 16th, Shealy Tr. at 116-17.[4]

Shealy never informed Starr or LaptopPlaza's insurance broker

---

Id. ¶ 7. In its complaint, LaptopPlaza claimed coverage in the alternative under this endorsement, but now does not oppose summary judgment with respect to that claim, see Pl. Opp. at 25 n.58.

[3] In its Counter Statement to Starr's Rule 56.1 Statement of Undisputed Material Facts, LaptopPlaza objects to many of Starr's statements concerning its storage of inventory that weekend on the ground that "the meaning of 'Trailer' as it relates to function and coverage is at issue."  P 56.1 ¶¶ 1-6, 8-9, 16, 18-21. However, the issue in this case is whether or not the stolen trailer was a temporary extension of the warehouse, as LaptopPlaza argues; there does not appear to be a genuine factual dispute as to whether the stolen structure leased by LaptopPlaza was what is commonly referred to as a "trailer."  Indeed, LaptopPlaza's corporate representative used the term to refer to the structure in which the goods were stored.  See, e.g., Shealy Tr. at 89-90 (acknowledging that the "temporary storage facility" referred to in the complaint was a trailer); id. at 92 (referring to the "trailer that was stolen").  Accordingly, we use the word "trailer" to describe the stolen storage structure.

[4] The record indicates that the service had been guarding the facility on weekends since October 2013, with 24-hour weekend coverage following a November incident.  Mallin Decl., Ex. H at LAPTOP 000996; Galindo Tr. at 19-20, 43-44.

of the decision to temporarily store inventory in the trailers.
D 56.1 ¶ 18; P 56.1 ¶ 18.   The inventory was moved into the
trailers on Saturday, December 14.   Initially, it was not supposed
to remain in the trailers past 5:00 p.m., but the rack installation
had not been completed by then and the inventory was left in the
trailers overnight.   See Shealy Tr. at 71-73 (explaining that
"[t]here was never a plan to leave inventory overnight" but that
the rack installation "didn't get done in time").

## III. **The Trailer Abuts the Warehouse Building**

The parties' dispute centers on the position and
functionality of the stolen trailer.   Yet nearly all facts related
to the position of the stolen trailer vis-á-vis the building are
undisputed.   The trailer was not a permanent fixture and was not
permanently attached to the building, nor was it temporarily
connected to the building through a ceiling, roof, or walls.   D
56.1 ¶¶ 3-4; P 56.1 ¶¶ 3-4.   Rather, the trailer abutted the
bumpers of one of the building's loading docks, and it was
impossible to back the trailer into the building at that dock.
D 56.1 ¶ 6; P 56.1 ¶ 6.   The trailer and building had separate
doors and locks, and the trailer's doors and locks were not
integrated into any alarm system in the building.   D 56.1 ¶¶ 4,
9; P 56.1 ¶¶ 4, 9.

LaptopPlaza used a leveling ramp "[t]o provide a bridge
between the trailer and the floor of the dock."   Shealy Tr. at 80.

The ramp, consisting of metal plates weighing several hundred pounds, allowed workers to move back and forth between the building and the trailer with a forklift.  P 56.1 ¶ 5(2); Shealy Tr. at 82, 84.  LaptopPlaza contends that these metal plates connected what it refers to as its "extended storage facility" to the "dock doors of the permanent warehouse."  Pl. Opp. at 13; see id. at 8 ("The temporary extension to the permanent warehouse was physically connected to the warehouse by way of a metal plate . . . ."); P 56.1 ¶ 5(2) ("[T]he ramp connecting the Warehouse to Trailer consisted of . . . metal plates weighing several hundred pounds. While the racks were being installed in the Warehouse, the metal plates created a secured floor between the Trailer and the warehouse . . . .").

## IV. Procedural History

LaptopPlaza commenced this action in September 2014, alleging that Starr had breached the Policy by failing to indemnify it for its loss.  LaptopPlaza initially brought two claims for breach based on two separate Policy endorsements.  After discovery, Starr moved for summary judgment; LaptopPlaza has now abandoned one of its claims, and presses only its claim for breach of the Warehouse Endorsement, see supra note 2.

**DISCUSSION**

Starr argues that there is no coverage under the Warehouse Endorsement because the stolen goods were not owned or held by LaptopPlaza "while temporarily detained in warehouses," Warehouse Endorsement ¶ 1, and because the stolen trailer did not comply with the fire protection and burglary warranties, see id. ¶ 12. Further, Starr contends that the trailer is not covered as an "Unnamed Location," id. ¶¶ 12, 6.

### I. Summary Judgment Standard

To prevail on a motion for summary judgment, the movant must "show[] that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The movant bears the burden of demonstrating the absence of a genuine issue of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). When the movant has properly supported its motion with evidentiary materials, the opposing party must establish a genuine issue of fact by "citing to particular parts of materials in the record." Fed. R. Civ. P. 56(c)(1)(A). An issue of fact is "genuine" if the evidence is such that a reasonable jury could return a verdict for the non-moving party. SCR Joint Venture L.P. v. Warshawsky, 559 F.3d 133, 137 (2d Cir. 2009). "A party may not rely on mere speculation or conjecture as to the true nature of the facts to overcome a motion for summary judgment." Hicks v. Baines, 593 F.3d 159, 166 (2d

Cir. 2010) (internal quotation marks and brackets omitted).   In

considering the motion, the Court is required to "constru[e] the

evidence in the light most favorable to the non-moving party and

draw[] all reasonable inferences in its favor." <u>U.S. Fid. & Guar.</u>

<u>Co.  v.  Fendi  Adele  S.R.L.</u>, 823 F.3d 146, 149 (2d Cir. 2016)

(internal quotation marks omitted).

## II. <u>Principles of Contract Interpretation</u>

Under  New  York  law,[5]  insurance  policies  are  interpreted

_____

[5] LaptopPlaza, organized under Florida law with its principal place of business in Miami, invokes this Court's diversity jurisdiction with respect to this suit against Starr, incorporated under Texas law with its principal place of business in New York. Compl. ¶¶ 6-7.  Pursuant to a choice-of-law provision, the Policy and all endorsements are governed by the "Federal Maritime Law of the United States," and "[i]n the absence thereof, the laws of the State of New York." Nicoletti Decl., Ex. 4 at 24, Policy ¶ 68.  Applying the choice-of-law rules of the forum state (New York), see Klaxon Co. v. Stentor Electric Mfg. Co., 313 U.S. 487, 497 (1941), we give effect to the law selected by the parties "so long as the chosen law bears a reasonable relationship to the parties or the transaction," Welsbach Elec. Corp. v. MasTec N. Am., Inc., 7 N.Y.3d 624, 629, 859 N.E.2d 498, 500 (2006).  General federal maritime law, which typically governs maritime insurance contracts, bears a reasonable relationship to the interpretation of this contract.  New York law is also sufficiently related given that Starr's principal place of business is in New York and the parties agreed to bring any suit in connection with or relating to and arising out of the Policy in New York, see Nicoletti Decl., Ex. 4 at 24, Policy ¶ 67,; see also McPhee v. Gen. Elec. Int'l, Inc., 736 F. Supp. 2d 676, 680 (S.D.N.Y. 2010) ("Where the parties agree to litigate their claims in the forum of the state whose law they have chosen, that is another factor in favor of applying the law of that forum."), aff'd, 426 F. App'x 33 (2d Cir. 2011).  As there is "no specific federal rule governing construction of maritime insurance contracts," Commercial Union Ins. v. Flagship Marine Servs., Inc., 190 F.3d 26, 30 (2d Cir. 1999), we apply New York law to the construction of the contract pursuant to the choice-of-law provision.
    We note that, to the extent we have admiralty jurisdiction over this action, under federal choice of law rules, we would reach the same result.  See Am. S.S. Owners Mut. Prot. & Indem. Ass'n v. Henderson, No. 10 Civ. 8033 (PGG), 2013 WL 1245451, at *3 (S.D.N.Y. Mar. 26, 2013) ("Under federal choice of law rules, a choice-of-law clause in a marine insurance contract governs unless (1) that jurisdiction has no substantial relationship to the parties or the transaction or (2) that jurisdiction's law conflicts with the fundamental purposes of maritime law." (internal quotation marks omitted)).
    In any event, the parties implicitly agree that New York law applies by citing only New York law with respect to construction of the Policy.

according to ordinary rules of contract interpretation.  See, e.g., Olin Corp. v. Am. Home Assurance Co., 704 F.3d 89, 98 (2d Cir. 2012).  "As a general matter, the objective of contract interpretation is to give effect to the expressed intentions of the parties."  Hunt Ltd. v. Lifschultz Fast Freight, Inc., 889 F.2d 1274, 1277 (2d Cir. 1989).  To meet this objective, we interpret the contract "according to common speech and consistent with the reasonable expectation of the average insured."  In re Viking Pump, Inc., 27 N.Y.3d 244, 257, 52 N.E.3d 1144, 1151 (2016) (internal quotation marks omitted).

At the outset, the Court must determine "whether the terms of the insurance contract are ambiguous."  Morgan Stanley Grp. Inc. v. New England Ins., 225 F.3d 270, 275 (2d Cir. 2000).  Terms are considered ambiguous if they are "capable of more than one meaning when viewed objectively by a reasonably intelligent person who has examined the context of the entire integrated agreement and who is cognizant of the customs, practices, usages and terminology as generally understood in the particular trade or business."  Lightfoot v. Union Carbide Corp., 110 F.3d 898, 906 (2d Cir. 1997) (internal quotation marks omitted).  If language in the policy is ambiguous, we "should consider extrinsic evidence submitted by the parties to assist in determining their actual intent."  McCostis v. Home Ins. Co. of Ind., 31 F.3d 110, 113 (2d Cir. 1994).

However, no ambiguity exists where the contract's language has "a definite and precise meaning, unattended by danger of misconception in the purport of the contract itself, and concerning which there is no reasonable basis for a difference of opinion." Hunt, 889 F.2d at 1277 (internal quotation marks and brackets omitted). "Language whose meaning is otherwise plain does not become ambiguous merely because the parties urge different interpretations in the litigation." Id. If unambiguous, "the obligations [the contract] imposes are to be determined without reference to extrinsic evidence." Id. "When the question is a contract's proper construction, summary judgment may be granted when its words convey a definite and precise meaning absent any ambiguity." Seiden Associates, Inc. v. ANC Holdings, Inc., 959 F.2d 425, 428 (2d Cir. 1992).

### III.  The Stolen Goods Were Not "in" the Miami Warehouse

Applying the above principles, we agree that the stolen inventory does not fall within the Warehouse Endorsement's coverage of goods and merchandise "owned by or held by" LaptopPlaza "while temporarily detained in" its warehouse located at 1801 NW 135th Avenue in Miami.[6]  Warehouse Endorsement ¶¶ 1, 12.  The

---

[6] The evidence indicates that LaptopPlaza leased space in the building at this address from a freight forwarding operation, which also occupied space in the building.  Mallin Decl., Ex. G, Property Loss Control Profile dated October 28, 2013.  We are not asked to determine whether the Warehouse Endorsement would cover LaptopPlaza's goods stored inside that neighboring space.

phrase "detained in warehouses" plainly does not reach storage in a trailer abutting that warehouse.

Contrary to LaptopPlaza's assertion, the absence of a definition for "warehouse" in the Policy does not in and of itself render "in warehouses" ambiguous. "Warehouse" is commonly defined as "[a] building used to store goods and other items," Black's Law Dictionary 1817 (10th ed. 2014), or "a structure or room for the storage of merchandise or commodities," Merriam-Webster's Collegiate Dictionary 1331 (10th ed. 1998). As a preposition in this context, "in" indicates "inclusion, location, or position within limits." Id. at 585. Together, and read in tandem with the schedule in Clause 12, the words "in warehouses" unambiguously limit coverage to goods included, located, or positioned within the boundaries of LaptopPlaza's buildings or structures listed in Clause 12, including the warehouse at 1801 NW 135th Avenue.

LaptopPlaza argues that given the "unique facts" of this case, the Warehouse Endorsement is ambiguous as it may reasonably be interpreted to cover merchandise stored in its "temporary extension[] to a warehouse." Pl. Opp. at 10, 8. It largely relies on the trailer's location abutting the bay doors and the presence of a plate or plates heavy enough to support a forklift connecting the floor of the trailer to the floor of the warehouse. However, these facts do not suggest that the trailer enlarged the warehouse's physical boundaries so as to "extend" it. It is

undisputed that the two structures were not constructed as an interconnected unit and were not temporarily attached by ceiling, roof, or walls.  D 56.1 ¶¶ 3-5; P 56.1 ¶¶ 3-5.  Nor is there any suggestion that the door of the trailer was somehow secured around the dock bay doors of the building so as to form one unbroken passageway.  To the normal observer, they would appear discrete—the trailer docked at the warehouse, rather than the trailer continuing the warehouse.  Reading "in warehouses" to encompass the trailer would thus "strain[] the contract language beyond its reasonable and ordinary meaning," Bethlehem Steel Co. v. Turner Construction Co., 2 N.Y.2d 456, 459, 141 N.E.2d 590, 593 (1957).

This language does not become reasonably susceptible to LaptopPlaza's interpretation on account of the leveling ramp between the trailer and building.  Notably, LaptopPlaza never asserts that the ramp was in place at the time of the theft, and on this record, it would not be permitted to advance that position. This is because it is undisputed that the building's dock bay doors could not be closed while a leveling plate was in use.  See D 56.1 ¶ 7; P 56.1 ¶ 7; see Shealy Tr. at 83 (admitting LaptopPlaza could not close dock bay doors fully if plate was in place).  Yet, in its complaint, LaptopPlaza alleged that on the evening of December 14, its temporary "storage facilities" were docked at its warehouse, and after its employees completed their work for that day and prior to the trailer being stolen early on December 15,

12

the employees "locked the doors of the storage facility and <u>closed</u> <u>and locked the loading dock doors</u>." Compl. ¶¶ 23, 25, 27-28 (emphasis added). These allegations constitute a judicial admission. <u>See</u>, <u>e.g.</u>, <u>Whitehurst v. 230 Fifth, Inc.</u>, 998 F. Supp. 2d 233, 248-49 (S.D.N.Y. 2014) ("[A]llegations in the Complaint are judicial admissions to which Plaintiffs are bound."). Having admitted that the dock bay doors were closed at the time of the theft and that the ramp could not span from building to trailer if that were so, plaintiffs cannot now argue that the ramp was in place when the trailer was stolen.[7] Moreover, even if it was in place, a "bridge between the Trailer and the dock door of the Warehouse," P 56.1 ¶ 5(2), does not by itself convert the former into the latter.

In order to emphasize that the trailer was used for storage rather than transport, LaptopPlaza relies on evidence of the absence of a tractor cab attached to the trailer and the presence

---

[7] LaptopPlaza appears to have no basis to suggest otherwise. In its responses to Starr's First Request to Admit, LaptopPlaza denied the following requests: "Request No. 5: The Trailer was not attached to the Warehouse at the time of the Loss. . . . Request No. 7: The Trailer and the Warehouse were not attached or connected by a floor at the time of the Loss." Nicoletti Decl., Ex. 3 at 2. When asked his factual basis for denying those statements, Shealy answered that the "van was docked and could not be moved without a semi tractor, and, therefore, it was a temporary appurtenance to the building." Shealy Tr. at 85-86. He was then asked if there was any "physical device attaching the trailer to the warehouse," and responded:
    A. Physically, no, other than weight, weight and position.
    Q. And what do you mean by "weight"?
    A. The physical weight of the trailer itself. I could not lift it and
    move it by myself.
<u>Id</u>. at 86.

of metal legs anchoring the trailer to the ground.  <u>See</u> Galindo
Tr. at 65-66 (operations manager of security service testifying to
observations of remaining trailers following loss).  Given that
the trailer was ultimately hauled away by a tractor cab, it is not
clear that these aspects of its orientation presented a substantial
impediment to removal.  <u>Cf</u>. <u>id</u>. at 66 (testifying to his
understanding that it was possible to lift trailer legs and move
trailer with a tractor cab).  More importantly, LaptopPlaza's
reliance on these facts misconstrues the relevant inquiry: whether
or not the trailer stored merchandise or was firmly fixed in place,
it was not part of the insured warehouse at 1801 NW 135th Avenue.

This conclusion is supported by <u>Royal Insurance Company of
America v. Sportswear Group, LLC</u>, 85 F. Supp. 2d 275 (S.D.N.Y.
2000) (Chin, <u>J</u>.), a coverage dispute involving the same law firms
appearing here.  In <u>Royal</u>, a container holding the insured's
merchandise was shipped from overseas to a warehouse in New Jersey
operated by the insured's receiving agent for storage and
distribution.  85 F. Supp. 2d at 277.  As personnel were not
present to unload it, the container was stored on the agent's
"premises outside the warehouse," and that night it was stolen
from the property.  <u>Id</u>.  The insured argued that its loss fell
within a provision of its policy providing coverage for goods
"temporarily stored in warehouses at locations listed in the
attached Schedule," which Schedule listed the address of the

agent's warehouse.  Id. at 277-78, 280.  On motions for judgment
on the pleadings, the Court declined to find the policy language
ambiguous.  In relevant part, it rejected the argument that to be
clear, the policy should have defined "warehouse" to include only
the interior portion thereof; the only reasonable reading of the
phrase "temporarily stored in warehouses at locations listed in
the attached Schedule" was that the policy "provides coverage only
when the property is located in warehouses."  Id. at 281 (emphasis
in original).

LaptopPlaza's attempts to distinguish Royal based on the
"nature of the container and its location," Pl. Opp. at 13, are
without merit.  Its "nature of the container" argument relies on
its already-rejected assertion that the trailer here merely
extended the covered warehouse.  Nor does the Royal container's
location in a warehouse yard, as opposed to abutting the dock bay
doors, strike us as significant given the undisputed facts
concerning the trailer setup.  Just as in Royal, the Policy
"unambiguously provides coverage only for property temporarily
stored 'in warehouses,' i.e., inside of warehouses," 85 F. Supp.
2d at 281.

Finally, we note that LaptopPlaza's proffered interpretation
would not correspond to the expectations of a reasonable insured.
In providing LaptopPlaza warehouse coverage, Starr underwrote the
risks associated with the specific properties listed in the

Warehouse Endorsement.[8]  Indeed, the endorsement states that Starr "shall not attach hereunder, except as otherwise provided, until each such store or warehouse has been submitted to and approved by [Starr]."  Warehouse Endorsement ¶ 2.[9]  The transfer of goods from the building into temporary and relatively portable trailers would likely materially alter Starr's risk calculation, and therefore one would expect to see express terms contemplating such a location if it were covered.[10]

IV. **The Trailer is Not Covered as an Unnamed Location**

LaptopPlaza argues in the alternative that coverage exists under Clause 6 of the Warehouse Endorsement, which provides that if the "Assured shall store or warehouse any goods at locations (excluding the Assured's premises) not listed in Clause 12, this insurance shall automatically apply for an amount not exceeding (**see schedule**)," Warehouse Endorsement ¶ 6 (emphasis in original).

---

[8] As discussed elsewhere, the Policy also provides more limited coverage with respect to "Unnamed Locations."

[9] Weeks after LaptopPlaza moved into the space, Starr arranged for a detailed loss control profile of the warehouse at 1801 NW 135th Avenue to be completed prior to the effective date of the Warehouse Endorsement.  See Mallin Decl., Ex. G, Property Loss Control Profile dated October 28, 2013.

[10] LaptopPlaza also cites to an e-mail from Starr's claims manager and deposition testimony of Starr employees in support of our finding ambiguity.  Specifically, it argues that the claims manager may have initially thought that the loss could be covered and been led to conclude otherwise only after receiving an inaccurate representation from a Starr underwriter that LaptopPlaza had asked for permission to store goods in trailers but had been denied.  These inferences urged by LaptopPlaza, not readily apparent to us from the evidence cited, do not alter the analysis.  See, e.g., Reiss v. Fin. Performance Corp., 97 N.Y.2d 195, 199, 764 N.E.2d 958, 961 (2001) ("[W]hether an ambiguity exists must be ascertained from the face of an agreement without regard to extrinsic evidence." (internal quotation marks omitted)).

The "schedule" in Clause 12 specifies certain "warehouses to which [Starr] hereby extend[s] approval": the 1801 NW 135th Avenue address, another Florida address, and "Unnamed Locations." Id. ¶ 12. While the first two addresses have corresponding insurance limits of $10 million and $1 million, respectively, "Unnamed Locations" has a limit of $50,000. Id.

Starr raises two arguments in response. First, Starr contends that LaptopPlaza ignores the parenthetical in Clause 6, which excludes coverage for goods located at its "premises," and thus excludes goods stored in a trailer docked at the warehouse at 1801 NW 135th Avenue. Second, Starr argues that even if the trailer counted as an Unnamed Location, LaptopPlaza breached the provision in Clause 12 "WARRANT[ING] THAT ALL LOCATIONS . . . INCLUDE CERTIFIED CENTRAL STATION SMOKE/BURGLAR ALARMS." Id.

We need not address the second argument because we agree with the first. Clause 6 provides for automatic coverage with a limit of $50,000 for warehouse locations not listed in Clause 12 by reference to the "Unnamed Locations" category in Clause 12's "schedule." However, recognizing that it is a "well settled principle of contract law that a court should not adopt a construction of a contract which will operate to leave a provision of a contract without force and effect," Nautilus Ins. v. Matthew David Events, Ltd., 69 A.D.3d 457, 460, 893 N.Y.S.2d 529, 532 (1st Dep't 2010) (internal quotation marks and ellipses omitted), we

conclude that Clause 6 unambiguously excludes coverage for goods that are stored or warehoused at the "Assured's premises" but not in one of the warehouses listed by address in Clause 12.  As it is undisputed that the stolen trailer had been "parked at the premises" of LaptopPlaza's warehouse facility, D 56.1 ¶ 1; P 56.1 ¶ 1, the loss is excluded from coverage as an Unnamed Location under the Warehouse Endorsement.

## CONCLUSION

For the foregoing reasons, Starr's motion for summary judgment is granted.  The Clerk of the Court is directed to terminate the motions pending at ECF Nos. 16 and 22 and close the case.

**SO ORDERED.**

Dated:    New York, New York
          August _/7_, 2016

                                        NAOMI REICE BUCHWALD
                                        UNITED STATES DISTRICT JUDGE

18